We'll hear Franklin v. Liberty Lines Transit. Good, thank you. Good morning. Good morning.  This court should reverse the lower court's decision to grant summary judgment to the defendants for two reasons. One, the district court erred in ruling that the plaintiff was unqualified for his position as a bus operator. And two, the district court erred in rejecting the comparators proffered by the plaintiff as not being similarly situated in all material respects. What does it mean to be unqualified under Title VII? Well, it depends on what the precedent says that... For a bus driver. To be qualified for a bus driver means that you're not able to operate the bus properly. And if you look at the Owen v. New York City Housing Authority decision, it just says that you need to be able to perform the duties of your occupation. And in this regard, it's simple. Mr. Franklin is licensed and qualified to drive a bus. And the court said that you may not be qualified if you don't keep records correctly or honestly. I'm not aware of any case that says that, but are you aware of any case that says that that is not so? That it's not so? I don't know any law on the subject either way. So the lower court relied on the Cruz case, Cruz v. The Trustees of Columbia University, which is a lower court decision that was affirmed by this circuit. And in that case, the judge said that because the plaintiff was admitted to theft, that he was essentially per se unqualified. What was his job? That person's job was a director in the university. But in this case, when the judge relied on... You didn't issue an opinion in that case, though. No, no, you didn't issue an opinion, but it was summarily affirmed by this court. So in this case, the lower court said that essentially is making a per se determination that if you're found to violate a company policy, then you're unqualified for the position. And that's problematic because it essentially overrules cases like Hills v. Coca-Cola, which explicitly says that while crime or other misconduct may be a legitimate basis for discharge, it is hardly one for racial discrimination. And if you follow the interpretation of the district court, he's saying that if an employee violates a company policy and they're found guilty by an arbitrator, then they're unqualified for their position and they can never make out a prime or facial case of discrimination. That's not what the law says in this circuit. It's also... The district court, when issuing that opinion, acknowledged the difficulty and the challenges that a plaintiff would have bringing a discrimination case with his interpretation of the rules, but it does nothing to alleviate that problem. And that's why this court needs to overturn that ruling. The second issue with the district court's decision is that it rejected the comparators that plaintiff put forward as being similarly situated in order to prove an inference of discrimination and for pretext. The district court was incorrect for three reasons in doing this. First, in this case, the district court ruled that our plaintiff was charged with theft of overtime and charged with falsification of a company record, while our comparators were only charged with theft of overtime. Therefore, they're not similarly situated. Why isn't that a valid distinction? Well, first of all, two of the comparators that are in the record have the exact same conduct as plaintiff. Kenneth Roth, for example, was charged with theft of overtime, and he also engaged in what the company defined as theft of falsification of company records. Kenneth Roth arrived at the garage, the final destination of his stop, at one time, and he put a different time on his day card. That's the company's definition of falsification of company records. He wasn't charged with it, but it's the exact same conduct that our plaintiff engaged in. So that's the first error. The second comparator that was overlooked was Jeffrey Wormuth, who actually was charged with theft of overtime, was charged with falsification of a day card, and was not terminated. In our case, identical charges. Jeffrey Wormuth, W-A-R-M-O-U-T-H. The second problem is it's a very narrow construction of the rules. To answer your question directly, the falsification of the day card is an incidental charge to the bigger, the main charge, and that's theft of overtime. Making a distinction between these two really is of no value. It's really punishing one employee for the method in which they create the larger infraction, versus an employee who creates the same infraction with potentially more egregious actions, but not identical to plaintiffs. So that's very problematic. Tell me, I'm slightly confused. You're not confusing me, but I'm slightly confused. How do you steal overtime without falsifying a time card? That's exactly what plaintiffs submit. Anyone who puts a time card with overtime that's not authorized is essentially falsifying the document, and that's one of our arguments. But the defendant argues that if you engage in personal time, for example, make a phone call during work hours, and then you get overtime for that, even though you put your correct hours on the record. In other words, the issue is, if you record accurately the time that you returned to the depot, and you wasted time, or you stole time, or you had another job, or whatever, then you haven't falsified your time card. Correct. If you put the correct time that you arrived, but if you engaged in personal activity during your work hours, then it's technically theft. It is said, it was found by the employer, that your client put down that he arrived back at 9.50, when in fact he arrived back at 8.50? At 9 o'clock. At 9 o'clock. Yes. Go ahead. You've reserved three minutes rebuttal. We'll hear you then. Thank you. Thank you, Your Honors. My name, if the court please, my name is Peter Pankin, like Peter Pan with a K-E-N at the end. I'm from Epstein, Becker, and Green. And my associate is Daniel Green, although he is not the name partner in the firm. What do you say to your adversary's argument that when you draw a distinction between stealing overtime and falsifying the time card, what you're doing is distinguishing between two techniques for doing the same thing, which is stealing overtime. Not so, Your Honor. Let me just go into what really happens. A bus driver is given a day card, which says this is your route. You're supposed to be here at X time. You're supposed to be there at Y time. And then at the end of the day, they come into the garage. And the time of coming into garage is not the time when they stop work. Because when they get into the garage, they have to do an inspection of the bus, a post-trip inspection of the bus. They also may have to drive the bus. We've talked about Roth. Roth, she says, arrived at a certain time. But if you look at Roth, you will see that Roth also had to drive the bus to the fuel line. And that was work. When you leave the bus, that's not work. There is also a distinction between. If you do work, after you get out of the bus, it's not work. That's correct. Once you leave the bus, it's the company's position that it is not compensable time. And you're supposed to go to the put in your day card. The day card entry has to be the time that you return the bus to the depot. No. It has to be the time you stopped work after you parked the bus. Well, then how do you know whether Mr. Franklin didn't work until 10 minutes to 10? Because they looked at the camera on the bus. And they saw that he arrived. If you keep working after he leaves the bus, what good does it do to look at the camera on the bus? They saw the camera on the bus. They saw that he left the bus, actually, at 9.08. He arrived at 9. He was talking to somebody, another employee, for eight minutes. And they saw him on the TV leaving the bus at 9.08. And this is one of the reasons why the arbitrator ruled that he was guilty of theft of overtime. I'm getting confused again. If he left the bus at 9.08, and if the time card reflects not when he leaves the bus, but when he finishes work, then how does anyone know whether he, Mr. Franklin, didn't keep working after that until 10 to 10? There was nothing he was doing. And, by the way, he admitted at three different hearings that he didn't work as well. At the first level, they have a very elaborate system of due process. They have a first-level hearing in which there is the union present. Before you get to the first hearing, right, somebody had to decide that between 9.08, or whatever the time was, and 9.50, he was not doing work. Right? There was nothing for him to do. And he admitted that he wasn't. Okay. Somebody had to decide there's at least 42 minutes unaccounted for. He wasn't working. Correct. Yes. On the basis of what evidence did that person make that initial determination without regard to what he admitted later, without regard to how many hearings there were, what's the evidence? There is no work to be done after you finish and close up the bus and proceed to the dispatch window. Proceed to the? The dispatch window, which is where you hand in the day card. But Mr. Roth did work afterward, as I understand it. No, he did work on the bus after he arrived at the depot. You get to the depot. And what was that work? Because I had difficulty with it. Oh, it was. Because Roth wasn't a valid comparator, which I know is. Roth said that he had to pull the bus into the fuel line, which was delayed on that particular night. And then he said that he had to do his post-trip inspection of the bus, which is done in the garage. Wouldn't you be able to check out whether, in fact, he did that by looking at the cameras? This whole place sounds like he did that with cameras. Well, the question is, I'm not sure that there were cameras at Roth's time. Let me just check and see. Roth was in 2010. There may or may not have been cameras, and there were only a few minutes that they were talking about, not asking for 40 minutes. But in any event, there is collateral estoppel under Coca-Cola that this gentleman was guilty of theft. And the issue is whether somebody who is guilty of theft is qualified under the McDonnell-Douglas Act. Look, I mean, if you have a bartender who can make 25 drinks in 10 seconds each, wouldn't you conclude that's a qualified bartender? Yes. He's on the clock. He's working behind the bar. If the person then is taking some of the money that's being paid and putting it in his pocket, does he become unqualified? I would think so. To be a bartender? I would think so. I would think that anybody who is stealing is... I'm not sure what's left of Title VII. Isn't this issue ultimately immaterial in this case? Let's assume for the sake of discussion that he was qualified because he's the best bus driver that ever went around the Indy 500 track. Okay? We're assuming he's qualified for purposes of my question. The bottom line is that Judge Roman concluded that whether qualified or not, there was not sufficient evidence here to permit a trier of fact to conclude that race was a factor in the termination. That's correct. I agree. I think Judge Roman not only said he didn't make the prima facie case, but he went on to say that we had a valid reason to terminate, which is theft. There's no question, I think, in anybody's mind that you can terminate somebody for theft and that there was no real evidence of racial discrimination. There's not a single comment quoted in the record from any supervisor or manager of a racial nature. There is a whole plethora of African American people who were gone through the process and who had reasons for their delay on the road and the reasons were accepted. In this case, he never had a reason. He never told us he was working. There's no evidence of people who are not African American going through this process because I'm sure everybody is, you know, fiddling. There are some. You will see, for example, there was Mr. Cotter who was terminated for theft of overtime. He was put back to work with a long suspension by the arbitrator because the arbitrator felt that they had been inconsistent in how they were doing these cases. And as a result, and according to his recommendation, they put out a memorandum. Inconsistent in what respect? The same penalty of termination. And this Mr. Cotter was black, white or something else? Yeah, Cotter was white. There was a Hispanic who was also put back to work by the arbitrator on that basis. They put out a memorandum that said that if you are guilty of theft of overtime, which this gentleman was found to be, you will be subject to termination. He read the memorandum. It's in the record. And it was clear. Neither Roth, there's a difference, Your Honors, between someone saying, look, I'm on the road. I'm supposed to be going on my dead head back to the garage. I pulled the bus over. There is a hearing. They're asked, why did you pull the bus over? They say, I had to go to use the restroom. I had a personal emergency. In one case, a gentleman, Mr. Dingman, had a problem. His daughter was ill. He received a call from his daughter while on the road. He pulled over after he finished his run, called him, but he was waiting. Now, Mr. Franklin never said that there was a reason for it. Thank you, Your Honor. We'll hear rebuttal. In December 2007, an arbitrator explicitly ruled that the employer defendant here was arbitrarily disciplining employees for theft of overtime. That is essentially what our plaintiff, the same exact claim our plaintiff is making. After that arbitrator made that ruling, the company issued a memo saying that all employees would be discharged for theft of overtime and they would not accept any excuses. But when you look at the comparators that plaintiff proffered. I'm sorry, but with this arbitrary conduct, was it race-based or was it just chaotic? We don't have the decision, the full decision on that. We just have the resulting memo. But the company continued to arbitrarily discipline employees for theft of overtime. There are eight Caucasian employees that were charged. Not one was fired. There are eight African American employees. Two were terminated. Three were suspended and two were warned. The employer makes big issue of the fact that there were two African Americans that were charged with theft of overtime. They were able to give excuses, but they kept their job. But what they don't mention is that they were formally warned while their counterparts were not warned for their excuses. Their reasoning were accepted without further investigation. Another important distinction that has to be made is the intensity of the investigations that were done for the Caucasian employees versus the minority employees. For the plaintiff, for example, the investigation entailed pulling his past day cards, reviewing the on-camera, the on-bus camera, reviewing the off-bus camera, pulling records of the type of passengers that were on the bus, and interviewing witnesses. But with one of the white drivers, they followed the suspicion by following the bus for like two days. Right. That was Ronald Dingman. They followed him for two days. That was the extent of the investigation. That does seem like a fairly extensive investigation. I mean, you just devoted two days to try to find something that somebody's doing wrong. But all of the African American employees were subjected to that and more. And for the Caucasian employees, that's the extent of their investigation. So Lamont Carroll, for instance, who's African American, and he received a warning. So you're saying that the warning is a formal process that the Caucasian bus drivers didn't receive? They did not for the identical conduct. For identical conduct. Right. Who should I look to particularly for a comparator on that? Michael Novak. He was counseled for the exact behavior. So, Your Honor, thank you very much, and we hope that you do a return to decision. Thank you both. We'll reserve decision. The case of United States v. Chaudet is taken on submission, and the case of Guy and Jimenez v. Sessions is taken on submission. That's the last case on calendar. Please adjourn court. Court is adjourned.